UNITED STATES v. GOLDBERG (No. 918).[1]

SCRAP IRON AND FREE ENTRY.

The regulations of the Treasury are explicit and they are reasonable and lawful in requiring that when free entry is claimed for goods under paragraph 500, tariff act of 1909, the importer must furnish a certificate of prior exportation of the goods, made by the collector and naval officer, if any, at the place of 'export; or failing in this, the production of them must be waived by the collector and naval officer, if any, at the port of entry. Neither the certificate nor the fact of waiver is here shown, and the goods were not entitled to free entry.—Lunham v. United States (1 Ct. Cust. Appls., 220; T. D. 31409).

United States Court of Customs Appeals, November 21, 1912.

APPEAL from Board of United States General Appraisers, Abstract 26417 (T. D. 31842).

[Reversed.]

*William L. Wemple,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, on the brief), for the United States.

No appearance for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

This is an appeal by the United States from the Board of General Appraisers sustaining the importer's protest as to scrap iron, which was assessed for duty under paragraph 118 of the tariff act of 1909 at $1 per ton.

The protest raised two issues: (1) That this iron was free of duty under paragraph 500 of the same act; and (2) that it was also entitled to free entry as old junk under the provisions of paragraph 600.

The latter claim in the protest was overruled by the board and no appeal therefrom having been taken by the importer, the only question before us is as to the correctness of the action of the board in sustaining the importer's claim first above mentioned.

The Government made an application for a rehearing before the board, which was denied. In this court the importer, by stipulation, submits the case upon the opinion of the Board of General Appraisers, the Government only filing a brief.

The record and files show the following material facts: March 26, 1910, one J. Rubin appeared before the consular agent at Guaymas, Mexico, and declared in the consular invoice for and on behalf of the Great Western Smelting & Refining Co. that the merchandise specified in the invoice, to the best of declarant's knowledge and belief was truly and bona fide the production or manufacture of the United States; that it was exported from the United States from the ports of Nogales and Naco about various dates; that it was returned not having been advanced in value or improved in condition by any process of manufacture or other means; that no drawback, bounty, or allowance had been paid or admitted thereon or on any part thereof. Such invoice showed that the merchandise was 2,059 gross tons of

locomotive, car, track, and miscellaneous railroad scrap, including manila rope and rubber hose. This merchandise was transported by the steamship *Hermine* and 682 tons thereof, more or less, were embraced in a consumption entry made by Emar Goldberg, the appellee, at the port of Seattle, Wash. A prior entry of the major portion of this shipment was made at San Francisco. Attached to the consumption entry at Seattle were three affidavits, the first two being made by said Emar Goldberg and dated April 19, 1910. The consumption entry paper is also dated April 19, 1910, and in the heading thereof it is stated that the merchandise was exported from Nogales and Naco, Ariz., on various dates.

In one of these two affidavits the affiant stated according to his best knowledge and belief that the merchandise was truly and bona fide the manufacture of the United States; that it was truly exported and imported as expressed in said consumption entry; that it was returned without having been advanced in value or improved in condition by any process of manufacture or other means; and that no drawback or allowance had been paid or admitted thereon or on any part thereof. In the other affidavit the appellee declared that he was the manager of the Great Western Smelting & Refining Co.; that, referring to the shipment of 2,059 tons more fully described in the consular invoice dated Guaymas, Mexico, March 26, 1910, the merchandise therein described was, to the best of affiant's knowledge, information, and belief, scrap material purchased from the Southern Pacific Railroad Co. of Mexico from its scrap pile at El Palmo, near Guaymas, Mexico; that it was the refuse of completed railroad equipment the manufacture of the United States exported to Mexico from Nogales and Naco in small lots at different times within the last 20 years, more or less; that due and diligent effort had been exercised, but unsuccessfully, to fix the various dates of exportation and to fully conform to the regulations of the Secretary of the Treasury regarding the reimportation of American goods. The third affidavit was made by said Rubin on the 4th day of April, 1910. Therein the affiant sets forth that he is the authorized buyer of the Great Western Smelting & Refining Co.; that thus accredited he visited Mexico and there purchased the importation composed as before stated and which aggregated about 2,446 tons, more or less; and that "in an earnest effort to identify a part of this shipment as of American manufacture he investigated matters and learned from the officials of the railroad company that out of the entire lot, 2,059 tons, more or less, were bona fide of American production or manufacture, but having been shipped in completed form of railroad equipment into Mexico from the United States in small lots at different times during the last 20 years or more, it was wholly impossible to determine the dates of exportation."

From the record it appears that 639.85 tons were entered at Seattle, 358.47 tons of which were old car wheels which clearly showed marks of American manufacture and were allowed free entry; that 231.81

tons thereof were in so small pieces that it was impossible to deter-
mine from the iron itself where it was made; that free entry thereof was
refused; and duty was assessed thereon at $1 per ton, as already stated.

Evidence was taken in the case at Seattle, May 24, 1911. The
appellee appeared as a witness and was asked if he knew the goods
to be of American origin. His answer was, "I think, so far as I
have been informed, to that effect." And it appearing that he had
no personal knowledge of the subject he was not permitted to further
testify in that regard. The customs examiner at Seattle was also
called as a witness on behalf of the protestant. He testified in sub-
stance that he recollected this importation; that as to the portion
held dutiable at $1 per ton, it did not show any evidence that it was
American goods returned nor any evidence that it was of foreign
manufacture; that the part of the cargo that did not show American
origin was a miscellaneous lot of scrap iron evidently gathered along
the line of a railroad; that there might have been some pieces of
it of American origin and entirely probable that a good portion of it
was of foreign origin; that there was no way in which it could be
segregated, and he made his conclusion on the assumption that it
was a mixed lot. In reply to the question as to what led him to
believe that it was entirely probable that a considerable portion was
of foreign origin, he said:

I think if you pick up scrap iron along the line of railroad, and the general knowledge
I have, it is almost impossible to import all these pieces that is used in repairing. I
think local shops would furnish their own material to make those repairs.

The Board of General Appraisers heard the importer's protest
August 24, 1911, and we quote the material part of its opinion.

The importer has complied with the regulations of the Secretary of the Treasury
and submits his case upon the faith of that fact. In the case of Carleton Dry Goods
Co., G. A. 6696 (T. D. 28633), it was held that where an importer complies with the
regulations of the Secretary of the Treasury relative to establishing the identity of
American manufactures of the kind described in paragraph 483, tariff act of 1897
(which is identical with paragraph 500 of the present tariff act), a prima facie case is
made out for the free entry of the goods. It was further held that this presumption
can be rebutted only by a report of the local appraiser affirmatively finding the articles
to be of foreign manufacture, or by other satisfactory evidence to the same effect.
The evidence in this case fails to show that the goods are of foreign manufacture.

In the before-mentioned application for rehearing it was,
among other things, averred that the importer had not satisfactorily
complied with the regulations of the Secretary of the Treasury rela-
tive to the entry of the merchandise of the kind described in para-
graph 500 of the tariff act of August 5, 1909. This paragraph provides
in substance that articles that are the manufacture of the United
States when returned after having been exported without having
been advanced in value or improved in condition shall be admitted
free of duty, but that proof of the identity of such articles shall be
made under general regulations to be promulgated by the Secretary

of the Treasury, and further that such free entry shall not apply to any article upon which an allowance or drawback has been made except upon the payment of duties equal to the drawbacks allowed.

It will be observed that said paragraph 500 is, so far as relates to the issues in this case, identical in its provisions with paragraph 483 of the tariff act of 1897. Thereunder the Secretary of the Treasury had promulgated general regulations applicable to the bringing into this country of merchandise therein mentioned. See articles 568 to 573, inclusive, of the Customs Regulations of 1908, which regulations we treat as applicable to this case. Therein among other things it is provided that if the merchandise is returned through a port other than that of original exportation "there shall be required a certificate from the collector and naval officer, if any, of the port where the exportation was made, showing the fact of exportation from that port." It is also provided that if such certificate is not produced a bond for its production may be given in an amount equal to what the duties would be if the merchandise were foreign; and it is further provided that the collector and naval officer, if any, may waive the production of evidence of outward shipment "when satisfied from an examination that the goods are of domestic origin and an affidavit of the owner or consignee shows that it is impracticable to obtain such evidence because the goods were exported in small lots at different times, or any other good reason." Waiver of the evidence of outward shipment, it is provided, shall not waive evidence for drawback on merchandise subject thereto, and it is finally provided that "in all cases of doubt as to the sufficiency of the evidence of American origin the facts should be reported to the department for decision and liquidation of the entry suspended."

The collector of customs at Port Townsend, Wash., of which we understand Seattle is a subport of entry, evidently pursuant to the regulations before mentioned transmitted the papers to the Treasury Department in Washington for instructions as to the proper classification of the 281.38 tons of scrap iron, evidently advising the department that he was unable to identify the same as American goods returned. Thereupon the department directed the classification that was made by the collector, and the letter so directing was before the board.

It appears that at the time the merchandise was entered the importer gave a bond for the production of the certificate of exportation thereof, as required by the general regulations hereinbefore mentioned, and it appears also that such certificate was not waived.

The Government contended before the Board of General Appraisers and urges here that the importer was not entitled to free entry of the 281.38 tons of scrap iron because of his failure to comply with the general regulations of the Secretary of the Treasury in that a certificate of exportation had not been produced and the production thereof had not been waived.

It will be observed that the regulations require the production of such certificate or waiver whenever the merchandise is returned to a port other than that of original .exportation and that the provision for the giving of a bond for its production does not excuse from later producing the same.

. We have examined the Carleton case (T. D. 28633) referred to by the board in its opinion, and therefrom it appears that the merchandise was packing cases which were claimed to be entitled to free entry as returned goods of American manufacture. In the opinion in that case the board said in substance that the importers had satisfactorily complied with the regulations of the Secretary of the Treasury relating to the subject of free entry of merchandise manufactured in the United States. The opinion, however, further proceeds in such language that we are in doubt whether the certificate of exportation required by the regulations was or was not furnished or waived in that case.

We are of opinion that in view of the facts of record hereinbefore recited in the case at bar the statement in the opinion of the board that "the importer has complied with the regulations of the Secretary of the Treasury" is not so far warranted as to justify the sustaining of the protest. The importer's claim is that the goods were originally exported from Nogales and Naco, Ariz. The entry was at Seattle, a port other than that of original exportation, and the general regulations of the Secretary of the Treasury are explicit that in such cases the importer must furnish a certificate of prior exportation from the collector and naval officer, if any, of the port of export, or that the production thereof must be waived by the collector and naval officer, if any, at the port of entry. Such waiver is permitted only when the collector and naval officer, if any, are satisfied from an examination that the goods are of domestic origin and the required affidavit is tendered showing that it is impracticable to obtain such evidence of outward shipment because the goods were exported in small lots at different times, or any other good reason. The importer has not furnished the certificate of prior exportation, nor have the proper customs officers waived the production thereof. Indeed in his affidavit, secondly before referred to, the appellee recognizes that he has unsuccessfully attempted to conform to the regulations. We think it is clear that giving a bond to furnish the certificate of previous exportation does not of itself relieve the importer of later furnishing the same, nor does it in anywise shift the burden of proof which is upon him to show such previous exportation. Its effect is to give him time in which to produce it or obtain a waiver of its production, one of which things he must do or his claim fails. He has done neither in this case.

We see no reason to depart from the conclusion we reached on a very similar question in the case of Lunham v. United States (1 Ct. Cust. Appls., 220; T. D. 31409), where, speaking of the same provi-

sions in the tariff act of 1897, we said in substance that these regulations made by the Secretary of the Treasury were reasonable and lawful; that compliance therewith or waiver thereof by the proper customs officers was a condition prerequisite to the right of free entry of goods claimed to be of American manufacture and returned to this country.

We do not understand the case of United States *v.* Dominici (78 Fed. Rep., 334) or United States *v.* Ranlett (172 U. S., 133), cited by the board in the Carleton case, *supra,* to be opposed to this construction of the law and regulations.

The result is that the judgment of the Board of General Appraisers is *reversed.*